IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CLEON J. KORDISTOS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs | ) | Civil Action No. 16-615 |
| | ) | |
| MT. LEBANON SCHOOL DISTRICT, | ) | Magistrate Judge Mitchell |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

Plaintiff, Cleon J. Kordistos, brings this action against Defendant, Mt. Lebanon School

District, alleging claims of discrimination under the Family and Medical Leave Act of 1993, 29

U.S.C. §§ 2601-54 (FMLA), and the Americans With Disabilities Act, 42 U.S.C.

§§ 12101-12117 (ADA), arising out of his termination, effective May 29, 2015, from his position

as Assistant Business Manager with the School District. Plaintiff contends that the School

District interfered with his rights under the FMLA, discriminated against him in retaliation for

taking FMLA leave, discriminated against him based on a disability and in retaliation for

requesting an accommodation in violation of the ADA, and failed to accommodate his request

for a reasonable accommodation in violation of the ADA.

Currently pending before the Court is a motion for summary judgment, filed by

Defendant. Plaintiff has filed a brief in opposition and Defendant has filed a reply brief. For the

reasons that follow, the motion will be granted with respect to Counts III, V and the ADA

discrimination claim in Count IV and denied with respect to Count I and the failure to

accommodate claim in Count IV.

Facts

Cleon Kordistos began his employment with Mt. Lebanon School District on August 31,

1999. (Kordistos Dep. 5:1-6.)[1] He was hired as a Payroll Administrative Assistant, and became Assistant Business Manager within the next two years. (Kordistos Dep. 6:12-17.)

The position of Assistant Business Manager was created by the Business Manager, Jan Klein due to her frequently being out of the office and needing someone to assume her duties when she was unavailable. (A.232-233.)[2] As Assistant Business Manager, part of Kordistos's duties included reviewing and directing daily investments, completing PDE-2071 forms, maintaining bond records, review bank reconciliation statements, maintain all federal program records, review preparation of book keeping entries, preparing for the annual audit, assisting external auditors, managing worker's compensation insurance program, as well as the healthcare billing for school district retirees. (A.75.)

Part of his duties also included the supervision of the Payroll Administrative Assistant, Accounting Supervisor, and the Accounts Payable/Receivable Administrative Assistant (A.312).

Kordistos's Job Duties Prior to FMLA Leave

As Assistant Business Manager, Kordistos reported to Director of Business Janice Klein. (Kordistos Dep. 6:18-21.)  Klein was his supervisor the entire time he held the Assistant Business Manager position. (Kordistos Dep. 7:9-11.)  He also later became part of the Human Resources Department, and reported to HR Director Steven Scheurer. (Kordistos Dep. 6:22-25.)

---

[1] Pl.'s App. (ECF No. 55) Ex. 1.

[2] Defendant's Appendix consists of 11 volumes of material (ECF Nos. 40-49, 59), which it cites by reference to a page number therein (e.g. "A.232"), utilizing a format commonly used in appellate proceedings.  The Local Rules of this Court state that a party should "cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record," LCvR 56(B)(1), and then submit the specific piece of evidence that supports the citation in an appendix, not the document in its entirety, LCvR 56(B)(3).  It is further noted that most of the 1526 pages of material in the Appendix are not cited anywhere in Defendant's Concise Statement or briefs and therefore should not have been submitted.  In the interest of moving this case forward, the Court will accept Defendant's citations and Appendix as provided, but counsel is advised to follow this Court's procedures in the future.

This change occurred when the workers' compensation portion of Kordistos's job was shifted to human resources. (Kordistos Dep. 7:18-25.) As Assistant Business Manager, Kordistos had supervisory authority over certain employees. (Kordistos Dep. 8:2-4.) These employees included the Payroll Administrative Assistant, the Accounting Supervisor, and the person in charge of Accounts Payable/Receivable. (Kordistos Dep. 8:18-24.)

The Payroll Administrative Assistant he originally supervised was Lynn Proie, who was later replaced by Bonnie Lackner. (Kordistos Dep. 9:3-5.) The Accounting Supervisor he originally supervised was Kathy Bello, who was later replaced by Jennifer Vetter. (Kordistos Dep. 9:5-8.) The Account Payable/Receivable individual he supervised was Judy Wagner. (Kordistos Dep. 9:8-9.)

He provided assistance to employees that were struggling with their work tasks, and analyzed their jobs to figure out how to make them more efficient and less difficult. (Kordistos Dep. 8:7-13.) He also had the authority to assign them tasks. (Kordistos Dep. 8:14-17.)

Prior to taking leave, Kordistos assisted with preparing the annual budget. (Kordistos Dep. 32:19-33:10.) In that capacity, he was asked to prepare estimates of Blue Cross/Blue Shield expenses, given the percentage of anticipated increase. (Kordistos Dep. 33:1-5.). He was also responsible for reviewing real estate tax dollar assessments and determining what percentage of that, based on prior history, would be received by the school so it could budget its anticipated real estate revenues. (Kordistos Dep. 33:6-10.) Kordistos also monitored state reports, which involved reporting different financial information to state authorities concerning the business dealings of the school. (Kordistos Dep. 40:23-41:5.)

He reviewed daily investments and cash flows as well. (Kordistos Dep. 43:15-18.) This required him to analyze the school's cash needs based on a timely schedule of spending and the

receipt of tax dollars, and work to maximize the interest earned by the school's investment dollars. (Kordistos Dep. 43:24-44:8.)

Kordistos balanced the monthly books for several different funds, and assisted supervisors in the public with accounting questions. (Kordistos Dep. 47:17-21, 48:8-12.) The latter involved running reports and advising supervisors of different departments, and, after the elimination of those positions, head teachers, how close they were to overspending their budget. (Kordistos Dep. 48:17-49:10.)

Also prior to his leave, Kordistos was responsible for managing Defendant's Blue Cross/Blue Shield program, analyzing and paying Blue Cross/Blue Shield monthly invoices and managing health insurance records. (Kordistos Dep. 50:12-53:5.) This was something that he did by himself, without the assistance of others. (Kordistos Dep. 53:6-9.) Kordistos was also responsible for workers compensation duties. (Kordistos Dep. 56:8-13.) Part of his duties in the Human Resources Department included assisting in managing employee benefits (A.430).

<u>Kordistos Takes FMLA Leave</u>

In March 2014, Kordistos suffered a heart attack, which led to a serious heart condition. (Kordistos Dep. 10:3-10.) As a result, he took FMLA leave during the period between March 2014 and June 2014. (Kordistos Dep. 10:3-10.) Kordistos informed the School District of his heart attack on March 14, 2014. (Kordistos Dep. 10:11-14.) He did so by contacting Stephen Scheurer, the HR Director of Mt. Lebanon. (Kordistos Dep. 10:15-20.)

Scheurer notified Kordistos of his FMLA eligibility, rights, and responsibilities by letter on March 25, 2014. (Kordistos Dep. 11:5-15; ECF No. 55 Ex. 2.) Scheurer also notified Superintendent Dr. Timothy Steinhauer of Kordistos's leave, and advised it was due to a

"medical issue." (Steinhauer Dep. 28:8-15.)[3] Kordistos was aware that the District would apply FMLA to his leave time. (Kordistos Dep. 12:9-12.)

Originally, Kordistos took sick leave starting March 13, 2014 as a result of his condition. (Kordistos Dep. 15:1-4.) His FMLA leave commenced on March 25, 2014. (Kordistos Dep. 14:16-20.)

Kordistos's Duties Are Reassigned

During his FMLA leave Kordistos's duties began to be assigned to other employees in his department. (Kordistos Dep. 35:3-6, 41:18-42:9, 43:21, 44:20-25, 47:17-25, 48:1-2, 53:12-17, 56:18-21; Vetter Dep. 15:16-19.[4]) Several other employees took over or continued to cover Kordistos's duties after his return from leave as well. (Kordistos Dep. 32:6-12.) During his leave, the duty of assisting with preparation of the annual budget was assigned to Jennifer Vetter. (Kordistos Dep. 35:3-6.) After his return, Vetter began to take over Kordistos's duties related to preparation of the annual budget. (Kordistos Dep. 36:3-10.) She was assigned the duty of preparing the Blue Cross/Blue Shield estimates needed for preparing the annual budget. She was also learning how to do the real estate estimates for the budget. (Kordistos Dep. 36:3-4.)

She kept this duty even though Kordistos had to help and teach her how to do it. (Kordistos Dep. 36:3-4, 9-10.). Vetter was also assigned the duty of monitoring state reports during Kordistos's leave. (Kordistos Dep. 41:18-42:9.) This duty was also not returned to Kordistos after he came back from leave. (Kordistos Dep. 41:22-24, 42:7-9.)

Instead, Kordistos was merely left to teach how to monitor them. (Kordistos Dep. 41:22-24.) Some of these duties were, again, assigned to Vetter. (Kordistos Dep. 41:22-24, 42:1-2, 7-13.) Kordistos instructed Vetter on how to prepare the state reports until he felt she had a

---

[3] ECF No. 55 Ex. 3.
[4] ECF No. 55 Ex. 4.

thorough enough knowledge to do them on her own. (Kordistos Dep. 43:2-8.)

Vetter acknowledges that she is "not sure" whether Kordistos's duties regarding treasurer report preparation were ever returned to him after his leave. (Vetter Dep. 14:17-24.) She continues to do this duty at present, and was instructed to by Klein after Kordistos was terminated. (Vetter Dep. 14:25, 15:8.) Vetter also began to take over Kordistos's duties of reviewing daily cash flows and balancing the monthly books during his leave. (Kordistos Dep. 43:21, 44:20-25, 47:17-25, 48:1-2.) She kept these duties after his return as well. (Kordistos Dep. 43:15-21, 47:17-21, 25, 48:1-2.)

Vetter further started taking over Kordistos's duty of assisting supervisors in the public with accounting questions "more and more" after his leave. (Kordistos Dep. 48:8-15.) Vetter took over Kordistos's Medicaid report duties during the time he was out as well. (Vetter Dep. 15:16-19.) She claims this duty was returned to him after his return because she did not understand how to do it. (Vetter Dep. 30:21-25.)  However, she does perform this duty now. (Vetter Dep. 15:20-22.). Similarly, Kordistos's Blue Cross/Blue Shield duties were reassigned to Bonnie Lackner and Vetter during his leave. (Kordistos Dep. 53:12-17.)

Enrollment of new employees and the management of moving retired employees from the active to retired group were assigned to Lackner. (Kordistos Dep. 53:12-15.)  Vetter took over the Blue Cross/Blue Shield duties related to the paying of invoices and the preparation of the voucher to pay. (Kordistos Dep. 53:16-17.) After his return to work, these Blue Cross/Blue Shield duties largely remained with Vetter and Lackner. (Kordistos Dep. 53:12-17; 54:1-6.) Vetter admits she "might have" kept Kordistos's duties related to health care payments after his return from leave, and currently performs this duty. (Vetter Dep. 17:9-14, 20-24.)

Lackner contends she was to keep the Blue Cross/Blue Shield retiree program until the

open enrollment period ended after Kordistos's return to work, but that his other Blue Cross/Blue Shield functions were returned to him. (Kordistos Dep. 53:18-25; 54:1-3; Lackner Dep. 10:1-2.[5]) However, she admits that she does not remember whether this program went back to Kordistos at any point. (Lackner Dep. 10:15-17.) Kordistos maintains these duties were never returned to him, and that he was merely allowed to assist people who called him with questions about Blue Cross/Blue Shield. (Kordistos Dep. 54:1-6.)

Vetter agrees that she was asked to cover Kordistos's job duties while he was on FMLA leave. (Vetter Dep. 8:20-23.) Specifically, she recalls being assigned the treasurer's reports, the insurance wires for employee health insurance, the Medicaid cost report, and the Title I, II, and III report duties. (Vetter Dep. 9:1-4.) She believes Klein assigned her these duties. (Vetter Dep. 9:5-6.) Lackner also agrees that she was assigned Kordistos's duties related to employee enrollment and coverage updating while he was on leave. (Lackner Dep. 9:2-7.) She was assigned this duty by Klein. (Lackner Dep. 9:12-16.)

Kordistos's human resource office duties were also reassigned during his leave. (Kordistos Dep. 56:18-21.) His duties related to benefit administration and leaves of absences were assigned to Maria Olivo. (Scheurer Dep. 14:11-21.)[6] His workers compensation duties were also assumed by Olivo during that time. (Kordistos Dep. 56:18-21.)

Scheurer admitted that many of Kordistos's HR responsibilities were not returned to him when he came back from leave. (Scheurer Dep. 25:11-17.) He testified he instead pulled a lot of those responsibilities back to his team of HR associates. (Scheurer Dep. 25:15-17.) Specifically, these duties were handled by Olivo. (Scheurer Dep. 26:5-7.) Scheurer said he did so because Olivo had "some expertise" in benefits administration. (Scheurer Dep. 30:1-3.) He conceded that

[5] ECF No. 55 Ex. 5.
[6] ECF No. 55 Ex. 6.

she had and he was aware of this expertise prior to Kordistos's leave, as it was based on insurance work she had done earlier in her career. (Scheurer Dep. 32:6-14.)

When asked why he pulled Kordistos's HR duties back to his HR team, Scheurer also stated that Kordistos "had been out for a while." (Scheurer Dep. 25:18-20.) Olivo took over these duties after his termination. (Vetter Dep. 28:20-25.) She was assigned that duty by HR Director Katie Devine. (Devine Dep. 11:19-21.)[7]

<u>Kordistos Returns to Work</u>

On May 22, 2014, Kordistos provided Scheurer with a medical memo from his doctor, Bruno Casile. (Kordistos Dep. 16:20-23.) This memo stated that Kordistos would be able to return to work on May 27, 2014, with certain restrictions. (Kordistos Dep. 16:24-17:5.) These restrictions required that he only work half days. (Kordistos Dep. 17:1-5.)

It also limited him to walking less than 150 feet at a time, and stated he must avoid stairs or strenuous activity for the next two weeks. (Kordistos Dep. 17:13-17.) His doctor further said he would require an ADA compliant parking space. (Kordistos Dep. 17:13-17.)

Kordistos did indeed return to work on May 27, 2014, working half days. (Kordistos Dep. 17:6-9.) He was able to return to work without restrictions on June 9, 2014, and did so. (Kordistos Dep. 26:8-20.) After Kordistos returned from leave, Klein assigned him "special projects." (Klein Dep. 16:25-17:5.)[8] This was part of his job prior to his leave as well. (Klein Dep. 17:6-8.)

For one such project, Klein would ask Kordistos to get information that the Board had asked her for as well as spreadsheets and reports so that she could make projections. (Klein Dep. 17:11-16.) She also had him keep track of money they had versus money they were not

---

[7] ECF No. 55 Ex. 7.
[8] ECF No. 55 Ex. 8.

receiving. (Klein Dep. 17:17-22.)

Defendant states that, upon his return to work full time, Kordistos assumed the duties that were assigned to other staff members while he was on leave (A.237-38).[9]  Plaintiff disputes this assertion, stating that: 1) some of his duties related to assisting with preparation of the annual budget were reassigned to Vetter (Kordistos Dep. 35:13-20); 2) his duty of monitoring state reports remained with Vetter (Kordistos Dep. 41:22-24, 42:1-2, 7-13); 3) Vetter also kept the duty of reviewing daily cash flows and balancing the monthly books and took on the duty of assisting supervisors in the public with accounting questions (Kordistos Dep. 43:15-21, 47:17-21, 48:1-2, 8-15); and 4) his Blue Cross duties remained for the most part with Vetter and Lackner (Kordistos Dep. 50:12-18, 53:12-17, 54:1-6).

Defendant contends that Kordistos never spoke with Jan Klein or expressed concerns regarding his duties being taken away from him (A.238).  Plaintiff responds that he did approach Klein to ask why his duties were not returned to him and made multiple attempts to ask Klein about it further.  (Kordistos Dep. 38:2-4, 42:22-24.)  Plaintiff notes that Klein does not deny such conversations, but instead said that she did not remember them.  (Klein Dep. 16:16-19.)

No one had ever told Kordistos that his duties were being taken away from him because of his FMLA use (A.354).  Kordistos never received any emails or memos stating that his duties were being taken away from him (A.354).  Upon his return to work, there was always something for Kordistos to do while at work (A.361).

Klein claims that Kordistos kept these duties until his termination. (Klein Dep. 47:22-25.) She stated that she is now working with Vetter on these projects because it is "in her area." (Klein Dep. 48:1-8.) Over time, Kordistos deduced the reassignment of his duties and Klein's

---

[9] This citation is to Klein's deposition, where her actual testimony was "as far as I know" (Klein Dep. 15:16).

avoidance of him were related to his FMLA leave. (Kordistos Dep. 40:2-7.) Following his return

to work, Kordistos asked Vetter when his duties would be returned to him. (Kordistos Dep.

37:15-20.)

He regularly made clear that he was ready to resume his prior duties full time. (Kordistos

Dep. 42:14-17.)  Vetter responded that this was "what Jan wants," referring to supervisor Jan

Klein. (Kordistos Dep. 37:22, 42:19.) Kordistos later approached Klein to ask why his duties had

not been returned to him. (Kordistos Dep. 38:2-4.)  Kordistos states that Klein told him that he

was now her assistant, and that this was what she wanted. (Kordistos Dep. 38:6-7.)  Kordistos

made multiple attempts to ask Klein about his duties being returned to him. (Kordistos Dep.

42:22-24.) However, each time Klein reiterated that this was the way she wanted it. (Kordistos

Dep. 42:24, 46:7-9.)

Klein also made an effort to avoid Kordistos at work following his return from leave.

(Kordistos Dep. 39:25-40:1.)  This conclusion was supported by his observation that he was

often asked how to do certain tasks by the people now performing his duties. (Kordistos Dep.

40:15-20.) Klein claims that Vetter did not retain any of Kordistos's significant duties after his

return from leave. (Klein Dep. 16:1-6.) However, she conceded that she did not know whether

Vetter continued to perform his "minor duties." (Klein Dep. 16:1-6.)  Klein testified that she

never gave anyone a directive not to return a job duty to Kordistos upon his return.  (Klein Dep.

47:12-17.)

She also claimed she did not know of any of Kordistos's duties Lackner retained after his

return. (Klein Dep. 16:7-13.) However, she conceded Lackner may have held on to any projects

that were not finished. (Klein Dep. 16:7-13.) When asked whether Kordistos ever approached her

about his duties being taken away from him, Klein said she did not remember. (Klein Dep.

16:16-19.) Similarly, when asked whether Kordistos ever discussed with her what his duties should be moving forward after he came back from leave, she said she did not remember any such conversation. (Klein Dep. 16:20-24.)

<u>Defendant Eliminates Kordistos's Position</u>

In December 2014 and January 2015, Defendant's Superintendent, Dr. Timothy Steinhauer, directed certain employees to disclose which employee positions they would eliminate if necessary, as part of a list of potential budget reductions. (Klein Dep. 18:24-25, 19:1-13, 18-20.) As superintendent, Steinhauer relied on his department heads to suggest these cuts, as he believed they had a better understanding of the day-to-day operations of the positions under them. (Steinhauer Dep. 21:24-22:6.)

This directive was shared with director of facilities Rick Marciniak, assistant superintendent for secondary education Ron Davis, assistant superintendent for elementary education Marybeth Irvin, director of communications Cissy Bowman, director of special education Ken Cross, director of information technology Chris Stengel, Jan Klein, and Katie Devine. (Devine Dep. 16:2-21; Steinhauer Dep. 9:2-8.)

No directive was given about how many people needed to be reduced. (Devine Dep. 17:4-7.) These employees were directed to find ways to save money and gain efficiency, and considerations were to include non-personnel expenditures as well as personnel positions. (Devine Dep. 17:10-14; Steinhauer Dep. 10:11-14.) Steinhauer discussed this matter with staff on a weekly basis. (Devine Dep. 17:15-18; Steinhauer Dep. 9:9-11.)

A shared running Google document related to budget cut recommendations, called a compiled concept list, was also created and regularly updated by central office administration. (Devine Dep. 18:8-25, 19:4-9; Steinhauer Dep. 10:21-22.) People were able to make suggestions

for potential cost saving and impact directly on the document. (Steinhauer Dep. 11:16-12:9.)

As part of this process, Klein and Katie Devine, the new human resources director, reviewed each individual in their departments, and identified their duties and which duties could be consolidated. (Devine Dep. 20:18-20.)  According to Steinhauer, the first time Kordistos's position was recommended to him for elimination was the winter of 2015. (Steinhauer Dep. 9:22-10:1.)  Klein and Devine recommended that Kordistos's position be eliminated. (Klein Dep. 18:17-20; Devine Dep. 20:8-10.)

Klein claims she recommended this position be cut because it was half in the finance department and half in the human resources department. (Klein Dep. 21:16-17.)  She stated because the duties would be split between two offices they would be easier to disperse. (Klein Dep. 21:16-21.)  Klein first discussed eliminating the position with the then-HR Director Steven Scheurer. (Klein Dep. 22:1-15.)

She claims that they felt that if one position had to be eliminated, it would be the Assistant Business Manager position. (Klein Dep. 23:1-3.) However, Klein also claims she does not recall whether Scheurer discussed his feelings with her related to eliminating the position. (Klein Dep. 22:23-23:3.) Scheurer retired before the decision was made, and was replaced by Katie Devine. (Klein Dep. 23:12-14.)

Katie Devine also had a role in deciding whether to end Mr. Kordistos's employment with the school district. (Devine Dep. 14:22-25.)  Devine states that in response to Steinhauer's administrative directive, she met with directors, had weekly central office meetings, and reviewed opportunities for a budget reduction and the impact it would have on students. (Devine Dep. 18:1-7.)  She agreed that Kordistos could be eliminated because the duties he was handling for the human resources office could be absorbed by others. (Devine Dep. 21:6-11, 24:14-17.)

12

Devine claimed to not recall if she had known at the time of the decision that Vetter had previously covered Kordistos's duties for any period of time. (Devine Dep. 26:1-3, 18-23, 27:8-11, 12-15.) However, she acknowledged that she was aware Kordistos's duties were absorbed by the business office staff during his leave. (Devine Dep. 26:7-9.)

Prior to the position being submitted to the Board in order to be considered for elimination, Klein discussed with Devine how the functions of the position would be handled if the Board accepted the recommendation. (Klein Dep. 29:10-15.) She also discussed it with Superintendent Timothy Steinhauer, and assured him that Kordistos's duties could be taken over by others in the office. (Klein Dep. 29:16-21.) After Kordistos's position was recommended for elimination, Steinhauer asked Klein who would take on his responsibilities and make sure the work got done. (Steinhauer Dep. 19:2-4.) Klein responded to Steinhauer orally. (Steinhauer Dep. 19:7-9.) Indeed, Klein told Steinhauer that this was possible because others in the office previously covered Kordistos's duties while he was on medical leave. (Steinhauer Dep. 22:16-19.)

Specifically, Klein told Steinhauer that Jennifer Vetter, Bonnie Lackner, and Maria Olivo had done Kordistos's duties while he was out on leave. (Steinhauer Dep. 22:20-25, 23:1.) Steinhauer also directed Devine to make sure that all of Kordistos's duties were appropriately reassigned, and that they had personnel capable of doing them. (Steinhauer Dep. 21:9-13.)

On March 31, 2015, Steinhauer decided that he was going to recommend terminating Kordistos to the School Board. (Steinhauer Dep. 20:2-9.) As per the Board's approval process, a proposed budget is presented to the Board in April at a discussion meeting, and is approved in May, thus giving the Board a month to consider alternative decisions. (Steinhauer Dep. 20:2-9.)

On May 19, 2015, Kordistos received a letter from Devine informing him that his

position being eliminated effective May 29, 2015. (ECF No. 55 Ex. 9.) The letter claimed that

his position was eliminated for economic reasons. Following Kordistos's termination, Klein met

with Vetter to discuss which of Kordistos's duties Vetter would now take over. (Vetter Dep.

24:22-25:2.) Klein told Vetter she would now handle "the insurance wires, the bond payments,

the federal reports, the Medicaid reports, [and] the treasurer's reports." (Vetter Dep. 25:10-14.)

All of these duties Klein discussed with Vetter had been performed by Vetter while Kordistos

was on leave. (Vetter Dep. 25:15-18.) Vetter also took over completing PDE 2071's twice a year,

a job previously performed by Kordistos. (Vetter Dep. 26:5-11.)

Bonnie Lackner took over duties involving insurance that had previously belonged to

Kordistos after he was terminated. (Vetter Dep. 27:12-23.)  She also disclosed that she assumed

Kordistos's health coverage duties after his termination. (Lackner Dep. 12:9-11.)  Olivo again

took over Kordistos's workers compensation duties after his termination. (Vetter Dep. 28:20-25.)

She was assigned that duty by Devine. (Devine Dep. 11:19-21.)  Devine says she selected Olivo

for this duty because she "was working with benefit related issues and she had an interest."

(Devine Dep. 12:2-3.)

Devine claimed she could not recall whether Olivo had experience in workers

compensation prior to Kordistos's termination. (Devine Dep. 14:8-11.)  However she then

conceded that she is in fact aware Olivo performed this duty while Kordistos was on FMLA

leave. (Devine Dep. 14:12-14.)  She states she "does not recall" whether she was aware of this

fact when she assigned Olivo the duty after Kordistos was fired. (Devine Dep. 14:18-21.)

Parking Spot

Prior to Kordistos's return to work, he provided the School District with a memo from his

doctor stating that he required an ADA compliant parking space. (Kordistos Dep. 16:20-23,

17:13-17 & Ex. 7.) His doctor also ordered that he work only half days for at least two weeks. (Kordistos Dep. 25:1-3.) On May 23, 2014, Scheurer emailed Kordistos claiming that he and director of facilities Carl Seleme had measured the distance of all possible parking stops, and that there were no ADA compliant spaces available within 150 feet of his office. In addition, the School District was undergoing several construction projects which restricted access to the entrance to the building used by Kordistos and greatly limited parking spaces. (Kordistos Dep. 19:1-25; A.408-09.) Scheurer suggested that Kordistos be dropped off and picked up by his wife each day, as she also worked for the School District. (Kordistos Dep. 13:16-19, 21:1-12.)

However, as he was working half days, Kordistos would have needed to be picked up at 11:15 a.m. each day, which did not coincide with his wife's lunch period. (Kordistos Dep. 21:1-7.) Kordistos indicated that he was unable to be dropped off and picked up after work each day, and thus needed access to his car. He requested that he be allowed to park in the left side of the loading dock area as a reasonable accommodation. (Kordistos Dep. 20:6-12.) Scheurer denied this request. (Kordistos Dep. 21:13-23.) He claimed that those spots did not qualify as ADA compliant and were not within 150 feet of his office. (Kordistos Dep. 21:13-23.)

Because of this refusal, Kordistos had to be driven to work by his wife each day. (Kordistos Dep. 23:3-7.). Despite being finished with work at 11:15 a.m. each day, Kordistos would have to wait for his wife's lunch hour to go home. (Kordistos Dep. 23:15-17.) His wife's lunch hour was from 12:00 p.m. to 1:00 p.m. each day. (Kordistos Dep. 24:1-2.) Thus, while working half days, Kordistos was often forced to wait 45 minutes after work each day during this period before he could go home. (Kordistos Dep. 23:15-17, 24:1-2.)[10]

---

[10] At Plaintiff's deposition, Defendant's counsel referred to him having to wait "maybe 15 minutes." (Kordistos Dep. 24:3-4.) This is incorrect, because he testified that he finished work at 11:15 a.m. and his wife's lunch hour began at 12:00, or 45 minutes later.

Defendant notes that Kordistos admitted that all of his requested accommodations had been honored by the School District. (A.329.) Plaintiff responds that, pursuant to his doctor's orders, he worked half days, and thus he finished at 11:15 a.m., 45 minutes before his wife was able to take him home during her lunch hour, which began at 12:00 p.m. (Kordistos Dep. 21:1-7, 23:15-17, 24:1-2, 25:1-3.) He thus denies that his requests – for an ADA-compliant parking space or for the ability to park on the left side of the loading dock – were accommodated. (Kordistos Dep. 16:20-23, 17:13-17, 19:1-25, 20:6-12, 21:13-23, 23:3-7.)

Procedural History

On December 23, 2015, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). By letter dated September 26, 2016, Plaintiff received a Notice of Right to Sue. (Am. Compl. ¶ 2.)

Plaintiff filed this action on May 16, 2016 (ECF No. 1). On October 10, 2016, he filed an Amended Complaint. (ECF No. 18.) Federal question jurisdiction is based on the discrimination statutes cited herein. Count I alleges that Defendant interfered with his rights under the FMLA. Count III[11] alleges that he was retaliated against for exercising his FMLA rights. Count IV alleges claims under the ADA for discrimination and failure to accommodate. Count V alleges retaliation in violation of the ADA.

On April 1, 2017, Defendant filed a motion for summary judgment (ECF No. 24). On May 11, 2017, Plaintiff filed a brief in opposition (ECF No. 52) and on June 2, 2017, Defendant filed a reply brief (ECF No. 58).

Standard of Review

---

[11] Neither the original Complaint nor the Amended Complaint contains a Count II.

The Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. Hugh v. Butler County Family YMCA, 418 F.3d 265, 266 (3d Cir. 2005); Doe v. County of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

Defendant argues that: 1) the FMLA interference claim should be dismissed because Plaintiff was not denied any benefits; 2) the FMLA retaliation claim should be dismissed because Plaintiff cannot point to any causal connection between his FMLA leave and the decision to eliminate his position in a reduction in force ("RIF"); and 3) his ADA retaliation claim should be dismissed for the same reason as the FMLA retaliation claim and he cannot maintain a claim for failure to accommodate because he received all the accommodations he requested.

Plaintiff responds that: 1) he was not "reinstated" to his prior position following FMLA leave, but rather many of his job duties were not returned to him, which not only violated the FMLA but also laid the groundwork for his later dismissal; 2) there was a clear pattern of antagonism following his return when his job duties were not returned, and there is also temporal proximity if properly measured from the moment he returned, and the RIF does not explain why his FMLA leave was taken into consideration in the decision to eliminate his position; and 3) the ADA leave was a request for an accommodation for which he was retaliated against and the accommodation he was provided was not "reasonable" because it denied him access to a car.

In a reply brief, Defendant contends that: 1) Plaintiff was returned to the same position with substantially the same duties and he cites testimony out of context to suggest otherwise; 2) he points to no pattern of antagonism, just his own "feeling" that his position had changed; and 3) there is no temporal proximity between his request for an accommodation and the elimination of his position, and he admitted that his requests for ADA accommodations were honored.

Counts I, III: FMLA Claims

The FMLA was enacted in 1993 for two purposes: to "balance the demands of the workplace with the needs of families" and to "entitle employees to take reasonable leave for medical reasons." 29 U.S.C. § 2601(b)(1-2). The Act grants to an "eligible employee," among other things, the right to twelve workweeks of leave, over any period of twelve months, "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The leave may be taken intermittently or by reduced schedule when medically necessary. 29 U.S.C. § 2612(b)(1).

The Act contains two relatively distinct types of provisions: a series of prescriptive substantive rights for eligible employees, often referred to as the "entitlement" or "interference"

provisions which set floors for employer conduct, 29 U.S.C. §§ 2612, 2614(a)(1); and protection against discrimination based on the exercise of these rights, often referred to as the "discrimination" or "retaliation" provisions, 29 U.S.C. § 2615(a)(1-2); 29 C.F.R. § 825.220(c). Callison v. City of Phila., 430 F.3d 117, 119 (3d Cir. 2005). An employee may bring suit to enforce these rights pursuant to section 2617(a) of the Act. Conoshenti v. Public Serv. Elec. & Gas Co., 364 F.3d 135, 141 (3d Cir. 2004). Plaintiff asserts both kinds of claims.

Interference Claim

The FMLA provides that:

any eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave shall be entitled, on return from such leave:

(A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or

(B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

29 U.S.C. § 2614(a)(1). Further, as stated in a regulation:

On return from FMLA leave, an employee is entitled to be returned to the same position the employee held when leave commenced, or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment. An employee is entitled to such reinstatement even if the employee has been replaced or his or her position has been restructured to accommodate the employee's absence.

29 C.F.R. § 825.214. The next section explains, inter alia, that:

An equivalent position is one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status. It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority….

An equivalent position must have substantially similar duties, conditions, responsibilities, privileges and status as the employee's original position….

The requirement that an employee be restored to the same or equivalent job with

the same or equivalent pay, benefits, and terms and conditions of employment
does not extend to de minimis, intangible, or unmeasurable aspects of the job.

29 C.F.R. § 825.215(a), (e), (f).

The Court of Appeals for the Third Circuit has held that, "[i]n order to assert a claim of
deprivation of entitlements, the employee only needs to show that he was entitled to benefits
under the FMLA and that he was denied them." Callison, 430 F.3d at 119. The court has further
explained that:

> Under this theory, the employee need not show that he was treated differently
> than others. Further, the employer cannot justify its actions by establishing a
> legitimate business purpose for its decision. An interference action is not about
> discrimination, it is only about whether the employer provided the employee with
> the entitlements guaranteed by the FMLA.

Id. at 119-20. In contrast, an FMLA retaliation claim is subject to the burden-shifting framework
applied to other discrimination claims (under Title VII, the ADEA and the ADA), as set forth in
McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973). Conoshenti, 364 F.3d at 146-47.

To make out a claim of interference under the FMLA, a plaintiff must establish:

> (1) he or she was an eligible employee under the FMLA; (2) the defendant was an
> employer subject to the FMLA's requirements; (3) the plaintiff was entitled to
> FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention
> to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she
> was entitled under the FMLA.

Ross v. Gilhuly, 755 F.3d 185, 191-92 (3d Cir. 2014) (citation omitted). As noted above, one of
the benefits to which an employee is entitled under the FMLA is reinstatement to his former
position or an equivalent position with the employer. Conoshenti, 364 F.3d at 141 (citing
§ 2614(a)(1)). Courts have held that "the restoration of salary, title, and benefits does not
necessarily constitute restoration to the same position within the meaning of section
2614(a)(1)(A) when the job duties and essential functions of the newly assigned position are
materially different from those of the employee's pre-leave position." Cooper v. Olin Corp.,

Winchester Div., 246 F.3d 1083, 1091 (8th Cir. 2001).  See also Parker v. Hahnemann Univ.

Hosp., 234 F. Supp. 2d 478, 491 (D.N.J. 2002) (certified nurse was offered other positions after

FMLA leave, but presented evidence that they were subordinate in status to her prior position

and had different duties).

Defendant contends that Plaintiff received all of the FMLA leave he requested and that he

was reinstated to his position upon his return.  Plaintiff disputes the latter assertion, contending

that, although he was given the same job title, many of his job duties were not returned to him

and he was instead assigned "special projects."

There are genuine issues of material fact as to this question.  Plaintiff has testified that: 1)

some of his duties related to assisting with preparation of the annual budget were reassigned to

Vetter (Kordistos Dep. 35:13-20); 2) his duty of monitoring state reports remained with Vetter

(Kordistos Dep. 41:22-24, 42:1-2, 7-13); 3) Vetter also kept the duty of reviewing daily cash

flows and balancing the monthly books and took on the duty of assisting supervisors in the

public with accounting questions (Kordistos Dep. 43:15-21, 47:17-21, 48:1-2, 8-15); and 4) his

Blue Cross duties remained for the most part with Vetter and Lackner (Kordistos Dep. 50:12-18,

53:12-17, 54:1-6).  In addition, Scheurer testified that he "pulled a lot of the responsibilities back

in to, you know, my team of HR associates" because, inter alia, Kordistos "had been out for a

while, so we had been already handling it in HR."  (Scheurer Dep. 25:15-21.)  Scheurer also

admitted that he assigned these HR duties to Olivo.  (Scheurer Dep. 26:5-7.)  Scheurer said he

did so because Olivo had "some expertise" in benefits administration. (Scheurer Dep. 30:1-3.)

He conceded that she had and he was aware of this expertise prior to Kordistos's leave, as it was

based on insurance work she had done earlier in her career. (Scheurer Dep. 32:6-14.)

Klein stated that, as far as she knew, his "significant duties" were returned to him, but as

to minor things, she did not know. (Klein Dep. 15-16.) She also claimed not to remember whether Kordistos ever approached her to express concerns about not having his duties returned, but Plaintiff testified that he did approach her several times and was told that this was "the way she wants it." (Kordistos Dep. 37:21, 38:2-7, 42:19-24.) Vetter testified that she handled the health care payments while Kordistos was out and "might have done it" after he returned from leave. (Vetter Dep. 17.) She was also "not sure" if she returned the duty of preparing treasurer reports to him, indicating that if he did not ask for it to be returned to him, then she would have continued to do it (Vetter Dep. 14:17-21). Lackner testified that she had picked up the open enrollment for retirees while he was on leave and she retained this duty only through the open enrollment period, but she "could not recall" if the duty ever was returned to him. (Lackner Dep. 10-11.)

Determining the credibility of these conflicting statements is the responsibility of the finder of fact. Accepting Plaintiff's version as true for purposes of this motion for summary judgment, he has supported a claim that his FMLA rights were interfered with when he was returned to a position with the same job title but significant parts of his job duties remained with other employees. Therefore, as to Count I of the Amended Complaint, the motion for summary judgment will be denied.

Retaliation Claim

Defendant argues that Plaintiff has failed to state a prima facie case of discrimination, citing to the familiar McDonnell Douglas burden shifting analysis. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). As the Court of Appeals has explained, a plaintiff :

> bears the initial burden of establishing a prima facie case by a preponderance of the evidence. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). When a plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to "articulate some legitimate,

> nondiscriminatory reason for the employee's rejection." McDonnell Douglas, 411
> U.S. at 802, 93 S.Ct. 1817. If the defendant meets this burden, the presumption of
> discriminatory action raised by the prima facie case is rebutted. Tex. Dep't. of
> Cmty. Affairs v. Burdine, 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207
> (1981). The plaintiff then must establish by a preponderance of the evidence that
> the employer's proffered reasons were merely a pretext for discrimination, and
> not the real motivation for the unfavorable job action. Id. at 253, 101 S.Ct. 1089;
> McDonnell Douglas, 411 U.S. at 804, 93 S.Ct. 1817.

Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797-98 (3d Cir. 2003) (footnotes omitted).

The framework cited above applies to discrimination cases brought under the FMLA's

retaliation provision. Capps v. Mondelez Global, LLC, 847 F.3d 144, 151-526 (3d Cir. 2017).

However, the court has held that a Department of Labor regulation stating that employers

"cannot use the taking of FMLA leave as a negative factor in employment actions," 29 C.F.R.

§ 825.220(c), as opposed to the "but-for" causation standard applied in Title VII retaliation

cases, is entitled to deference under Chevron v. Natural Resources Defense Council, 467 U.S.

837 (1984). Egan v. Delaware River Port Auth., 851 F.3d 263, 270-73 (3d Cir. 2017).

To state a prima facie case of FMLA retaliation, a plaintiff "must show that (1) he

invoked his right to FMLA-qualifying leave, (2) he suffered an adverse employment decision,

and (3) the adverse action was causally related to his invocation of rights." Capps, 847 F.3d at

152 n.6. The Court of Appeals has stated that:

> To establish the requisite causal connection a plaintiff usually must prove either
> (1) an unusually suggestive temporal proximity between the protected activity and
> the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing
> to establish a causal link. See Krouse v. American Sterilizer Co., 126 F.3d 494,
> 503-04 (3d Cir. 1997); Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d
> Cir.1997). In the absence of that proof the plaintiff must show that from the
> "evidence gleaned from the record as a whole" the trier of the fact should infer
> causation. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000).

Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).

The parties agree that Plaintiff took FMLA leave and that he suffered an adverse

employment action when he was terminated.  But Defendant contends that Plaintiff cannot establish a causal connection between these events because approximately a year elapsed between them and he points to no other basis for a causal connection.  Plaintiff responds that: 1) there is temporal proximity if it is properly measured from the time he returned from FMLA leave, at which point his job duties were not returned to him (ultimately leading to his termination when decisions were made about eliminating positions because of economic factors); and 2) there is a clear pattern of antagonism which began when he returned and his duties remained with others.  Defendant replies that the time is properly measured as a year after he returned from FMLA leave, so there is no temporal proximity and Plaintiff's alleged pattern of antagonism consists solely of his own conspiracy theory and is not based on any evidence.

Plaintiff cites Marra v. Philadelphia Housing Authority, 497 F.3d 286, 305 (3d Cir. 2007).  In that case, the court observed that, although Marra was not formally terminated until March 2002, the evidence showed that supervisors had discussed eliminating his position as early as fall 2001and first recommended it in November 2001. The record supported a five-month gap between Marra's protected activity (trial testimony against his employer in June 2001) and subsequent termination, and the causal connection was supplemented by incidents of harassment in the interim such as vandalization of his computer in July 2001, his exclusion from an important July 2001 meeting, the reassignment of DiGravio (his co-plaintiff) over his objections, a supervisor's "look of disgust" upon hearing that he testified against the employer and his involuntary demotion received shortly after giving deposition testimony earlier in the trial.  Id. at 305.

In this case, Plaintiff does not contend that the School District planned to eliminate his position from the moment he returned from FMLA leave.  Rather, his argument is that when the

School District failed to return his duties to him upon his return, this act made his position vulnerable to being eliminated in a RIF the following year because it appeared he had little work to do. However, he does not argue – and there would be no support for such an argument – that the failure to return his job duties to him constituted an "adverse employment action." Thus, the measurement runs from the date Plaintiff returned from FMLA leave (May 27, 2014) to the date the School District first considered eliminating his position (during the winter of 2015), or a period of approximately 7 months. This is too long to establish temporal proximity. See Leboon v. Lancaster Jewish Community Center Ass'n, 503 F.3d 217, 232 (3d Cir. 2007) (a gap of 3 months between protected activity and adverse action, without more, is insufficient).

On the other hand, failing to return Plaintiff's job duties to him when he resumed work after FMLA leave and Klein's continued response that this was "the way she wanted it" could be considered ongoing acts of antagonism, much like the incidents cited in the Marra case. Thus, Plaintiff has stated a prima facie case of retaliation discrimination.

The burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for terminating Plaintiff's employment. Defendant has met its burden by citing the budget cuts and need to reduce costs, as well as its conclusion that Plaintiff's position, along with two others, would be the least disruptive and cost effective to eliminate.

Plaintiff responds that, although budget cuts may have been necessary, that fact does not create a reason to choose a particular employee. The Court of Appeals has held that:

> even in a genuine RIF (one that is motivated on a programmatic level by economic concerns), individuals may not be selected for layoff on the basis of age. For this reason, even in a RIF, we use the McDonnell Douglas framework to expose such discrimination. The employer must have age-neutral reasons for deciding to lay off certain employees, and the employee can challenge these reasons as pretextual. See, e.g., Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231, 236-38 (3d Cir.1999) (considering whether the employer's rationales for terminating an employee during a RIF were pretextual).

Tomasso v. Boeing Co., 445 F.3d 702, 707 (3d Cir. 2006).

Defendant's neutral reason for deciding to eliminate Plaintiff's position is that it was half in the finance department and half in the human resources department. It also notes that two other positions were eliminated in the same RIF. Plaintiff argues that witnesses testified that they believed his job duties could easily be absorbed by others, in part because they had done so when he was out on FMLA leave.

The Court of Appeals has held that:

> To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence," and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."

Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994) (citations omitted). Or put another way:

> [W]e do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere. Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior.

Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 332 (3d Cir. 1995).

Thus, Plaintiff could not demonstrate pretext by claiming that the School District's decision was wrong in that his position was not relatively easy to eliminate, and he does not present this argument. As noted above, "it is not enough for a plaintiff to show that an employer's decision was wrong or mistaken, because the issue is whether the employer acted with discriminatory animus." Abramson v. William Paterson College, 260 F.3d 265, 283 (3d Cir.

2001).

At this stage of the proceedings, Plaintiff must demonstrate that the School District's articulated reason for his termination was a pretext for unlawful retaliation discrimination. He can proceed along "Fuentes prong one" by arguing that he has submitted evidence from which a factfinder could reasonably disbelieve the employer's articulated legitimate reason. Keller v. ORIX Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc). Or he can proceed along "Fuentes prong two" by arguing that Defendant's own evidence "allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Id. at 1111.

Plaintiff contends that: Klein recommended to Steinhauer that Kordistos's position be eliminated; that Steinhauer inquired who would take on Kordistos's duties; that Klein responded that the duties could be covered by people who had taken them on during Kordistos's FMLA leave; and that, with this information, Steinhauer decided to recommend to the Board the elimination of Kordistos's position. (ECF No. 52 at 14.) Even accepting all of these facts, however, Plaintiff's argument suffers from a fatal fundamental flaw: the FMLA does not prohibit employers from reassigning an employee's duties while the person is on FMLA leave, and thus the employer's "knowledge" that was gained during this period of time (that the duties can be performed by others) which is later used to eliminate an employee's position in a RIF cannot be attacked as demonstrating discriminatory animus. Despite Plaintiff's contentions, the evidence to which he points does not support an inference that the School District considered his FMLA leave as a "negative factor" in deciding that his position could be eliminated in a RIF, but only that the School District took into consideration how his duties could be redistributed if his position was eliminated, knowledge that it gained during as a result of his FMLA leave.

Moreover, Plaintiff's argument is not supported by any citation to authority. On the contrary, in the Marra case, which Plaintiff cites, the court specifically held that evidence of pretext was demonstrated in part because no other employees were terminated in the alleged RIF. The court contrasted the situation with cases in which employees failed to demonstrate pretext because other positions in addition to the plaintiff's position were eliminated. 497 F.3d at 307. That is this situation: two other employees had their positions eliminated as a result of neutral evaluations of economic factors.

Plaintiff contends that this fact is "irrelevant," but cites no authority for this contention. In fact, it is a relevant consideration, as the Marra case indicates. See also Tirk v. Dubrook, Inc., 2016 WL 427738, at *6 (W.D. Pa. Feb. 4, 2016) (Conti, C.J.) (employee admitted that his job responsibilities were absorbed by others after he was terminated in a RIF, but attempted, albeit unsuccessfully, to argue that two other employees terminated in a RIF were actually terminated for other reasons), aff'd, 673 F. App'x 238 (3d Cir. Dec. 27, 2016).[12] The fact that Kordistos's position may have become "vulnerable" to being eliminated because the School District had previously not returned all of his duties to him does not demonstrate that the elimination of the position itself as part of a RIF was a pretext for unlawful retaliation discrimination. Therefore, with respect to Count III of the Amended Complaint, the motion for summary judgment will be granted.

Counts IV-V: ADA Claims

In Count IV, Plaintiff alleges that the School District discriminated against him on the basis of his disability and that it also failed to accommodate him. In Count V, he alleges that the

---

[12] Plaintiff does not argue that the RIF was an elaborately constructed artifice to conceal the School District's desire to discriminate against him for having taken FMLA leave and there would be no support in the record for this theory in any event.

School District retaliated against him for requesting FMLA leave.

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless the covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity…." 42 U.S.C. § 12112(b)(5)(A). An employer's adverse employment action because of an employee's disability and the employer's failure to accommodate the employee's disability are distinct actions that can form the basis of separate claims. See Colwell v. Rite Aid Corp., 602 F.3d 495, 503 (3d Cir. 2010) (analyzing employee's constructive discharge claim separately from her failure to accommodate claim).

Discrimination against an individual who has opposed a practice prohibited by the ADA or who has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under the statute is itself actionable conduct. 42 U.S.C. § 12203(a). The remedies and procedures of Title VII apply to ADA retaliation claims. 42 U.S.C. §§ 12117(a), 12203(c).

Failure to Accommodate Claim

The Court of Appeals has stated that:

applicable regulations provide that in order "[t]o determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the [employee] in need of accommodation. This process should identify the precise limitations resulting from the disability and the

potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(*o*)(3).

Similarly, the EEOC's interpretive guidelines provide that: "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." 29 C.F.R. pt. § 1630, app. 1630.9 at 359.

In Mengine v. Runyon, we held that "both parties have a duty to assist in the search for an appropriate reasonable accommodation and to act in good faith." 114 F.3d 415, 420. In Taylor v. Phoenixville Sch. Dist., we concluded that the interactive process must include sufficient notice to inform the employer that an employee is requesting an accommodation followed by good faith participation of the employer and employee in that interactive process. 184 F.3d 296, 319-20 (3d Cir. 1999). "[T]he purpose of the interactive process is to determine the appropriate accommodations: '[t]his process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations.'" Id. at 316. "When the interactive process works well, it furthers the purposes of the ... ADA." Mengine, 114 F.3d at 420. It may, in fact, not only lead to identifying a specific accommodation that will allow a disabled employee to continue to function as a dignified and valued employee, it may also help sensitize the employer to the needs and worth of the disabled person. It therefore furthers the interest of the employer, and the dignity and humanity of the disabled employee.

Conneen v. MBNA Am. Bank, N.A., 334 F.3d 318, 329-30 (3d Cir. 2003).

The Court of Appeals has held that:

an employee who tries to hold his/her employer responsible for a breakdown in the interactive process under the ADA must show:
1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

Id. at 330-31 (citing Taylor v. Phoenixville Sch. Dist., 184 F.3d at 319-20).

Defendant cites a district court case which stated that:

Our Court of Appeals has stressed, however, that "where a plaintiff cannot demonstrate reasonable accommodation, the employer's lack of investigation into reasonable accommodation is unimportant." Donahue v. Consol. Rail Corp., 224

F.3d 226, 233 (3d Cir. 2000) (Alito, J.) (internal quotation marks omitted). The Court of Appeals for the Sixth Circuit has also noted that "an employee cannot make his employer provide a specific accommodation if another reasonable accommodation is instead provided," Hankins v. The Gap, Inc., 84 F.3d 797, 800-01 (6th Cir. 1996), inasmuch as "the employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide." 29 C.F.R. Pt. 1630, App. § 1630.9(a).

Solomon v. School Dist. of Phila., 882 F. Supp. 2d 766, 779 (E.D. Pa. 2012).

Defendant contends that Plaintiff did not have the right to compel the School District to provide the specific accommodation he wanted if another reasonable accommodation was provided instead. Thus, although Plaintiff requested an ADA-compliant parking space within 150 feet of the building, the School District asserts that it could not provide this accommodation and instead accommodated him by having his wife drive him to and from work. Plaintiff admitted that, with this accommodation, he was able to resume his duties. (Kordistos Dep. 24:16-19.) Thus, he agrees that the accommodation was effective. However, he complains about the reasonableness of this accommodation, because he had to wait 45 minutes from the time he was finished with work (11:15 a.m.) until the time his wife's lunch break began (12:00 p.m.).[13] He states that this situation continued "[f]or the duration, until the finance office moved to the science wing." (Kordistos Dep. 24:5-6.)

There are genuine issues of material fact as to whether this accommodation was "reasonable." Therefore, with respect to the failure to accommodate claim in Count IV, the motion for summary judgment will be denied.

---

[13] Defendant argues that Plaintiff admitted at his deposition that all of his requests for accommodation, including not having to walk more than 150 feet to his car, were honored by the School District. (Kordistos Dep. 25.) However, he also testified that he had difficulties with the arrangement of his wife picking him up and dropping him off and the wait involved. (Id. at 18-24 & Ex. 8.) To the extent that there are inconsistencies in his testimony, the trier of fact must resolve them. See Howard v. Blalock Elec. Serv., Inc., 742 F. Supp. 2d 681, 707 (W.D. Pa. 2010).

<u>Discrimination and Retaliation Claims</u>

Defendant argues that Plaintiff has failed to state a prima facie case of discrimination on the basis of his disability or in retaliation for requesting an accommodation, citing to the familiar <u>McDonnell Douglas</u> burden shifting analysis stated above.  It further contends that it has proffered a legitimate, non-discriminatory reason for its action and that Plaintiff has failed to proffer evidence that this reason was a pretext for unlawful discrimination on the basis of his disability or in retaliation for his having requested an accommodation.

The Court of Appeals has held that: "Prohibited discrimination under the ADA includes retaliation against an employee for requesting an accommodation." <u>Sulima v. Tobyhanna Army Depot</u>, 602 F.3d 177, 188 (3d Cir. 2010) (citation omitted).  However, as noted above, there must be a causal connection between the request and the retaliation.

As explained above with respect to the FMLA retaliation claim, assuming that Plaintiff can establish a prima facie case of disability or retaliation discrimination, Defendant has proffered a legitimate, non-discriminatory reason for terminating Plaintiff's employment, namely the RIF and its conclusion that his position, along with two others, could be eliminated as part of the overall budget reduction process.  Moreover, Plaintiff's evidence of pretext consists solely of his contention that, because Defendant had already distributed many of his job duties during his FMLA leave and did not return them to him afterward, his position became more vulnerable to being eliminated.  Accepting this fact as true does not rebut Defendant's proffered reason. Therefore, with respect to the ADA discrimination claims in Counts IV and V of the Amended Complaint, the motion for summary judgment will be granted.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CLEON J. KORDISTOS,              )
                  Plaintiff,     )
                                 )
    vs                           )        Civil Action No. 16-615
                                 )
MT. LEBANON SCHOOL DISTRICT,     )        Magistrate Judge Mitchell
                  Defendant.     )

ORDER

AND NOW, this 21st day of August, 2017, for reasons explained in the accompanying memorandum,

IT IS HEREBY ORDERED that the motion for summary judgment filed on behalf of the Defendant (ECF No. 24) is granted with respect to Counts III, V and the ADA discrimination claim in Count IV and denied with respect to Count I and the failure to accommodate claim in Count IV.

s/Robert C. Mitchell _____
ROBERT C. MITCHELL
United States Magistrate Judge